IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| OAKWOOD HOMES CORP., et al., | : | Chapter 11 |
| | : | Case No. 02-13396 (PJW) |
| Debtors. | : | |

| | | |
|---|---|---|
| OHC LIQUIDATION TRUST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 07-799 JJF |
| | : | |
| CREDIT SUISSE FIRST BOSTON, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

Tony Castañares, Esquire; Stephan M. Ray, Esquire; Scott H. Yun,
Esquire and Whitman L. Holt, Esquire, of STUTMAN, TREISTER &
GLATT, P.C., Los Angeles, California.
Marla Rosoff Eskin, Esquire; Kathleen Campbell Davis, Esquire and
Kathryn S. Keller, Esquire of CAMPBELL & LEVINE, L.L.C.,
Wilmington, Delaware.

Attorneys for Plaintiff.

R. Paul Wickes, Esquire; Mary K. Warren, Esquire; Michael J.
Osnato, Jr., Esquire and J. Justin Williamson, Esquire of
LINKLATERS L.L.P., New York, New York.
Mark D. Collins, Esquire; Russell C. Silberglied, Esquire; Anne
S. Gaza, Esquire and Lee E. Kaufman, Esquire of RICHARDS, LAYTON
& FINGER, P.A., Wilmington, Delaware.

Attorneys for Defendants.

**MEMORANDUM OPINION**

June 9, 2008
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion for Partial Summary Judgment (D.I. 39) filed by Defendants Credit Suisse, Credit Suisse Securities, LLC, Credit Suisse Holdings, and Credit Suisse, Inc. (collectively, "Credit Suisse").   For the reasons discussed below, the Court will grant Defendants' Motion.

BACKGROUND

I.    **Procedural History**

On November 15, 2002, Oakwood Homes Corporation, and its subsidiaries and affiliates (hereinafter "Oakwood") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").   In re Oakwood Homes Corp., 340 B.R. 510, 517 (D. Del. 2006).   The Bankruptcy Court confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and its Affiliated Debtors and Debtors in Possession" ("the Plan") on March 31, 2004, and the Plan became effective as to all Debtors on April 27, 2004.   Id.   The OHC Liquidation Trust ("OHC" or "Plaintiff") was deemed established as of the Plan's effective date, and vested with the power to prosecute, compromise or settle adversary proceedings.   Id. Pursuant to this power, on November 13, 2004, Plaintiff instituted this proceeding, objecting to Credit Suisse's proofs of claim, and asserting counterclaims.   On February 29, 2008,

Credit Suisse filed the instant Motion for Summary Judgment (D.I. 39). In response, Plaintiff filed a Counter-Statement certifying that Genuine Issues of Material Fact Exist (D.I. 50) pursuant to the Court's summary judgment procedure on March 13, 2008, and Credit Suisse's Reply was filed on March 31, 2008. The Court ordered additional briefing on Credit Suisse's Motion on April 29, 2008, which was submitted by May 19, 2008 (D.I. 80), and oral argument on Credit Suisse's motion was held on May 21, 2008.

Credit Suisse's Motion for Partial Summary Judgment is based on the following contentions. First, Credit Suisse contends that summary judgment is appropriate on all of OHC's pre-contract claims because the application of the *in pari delicto* doctrine bars OHC from asserting any claims for damages arising out of Credit Suisse's provision of securitization services. Credit Suisse contends that summary judgment is appropriate on OHC's breach of fiduciary duty claim because, if Credit Suisse had a fiduciary duty, it ran to Oakwood, acting through its Management and Board, not to any particular class of stakeholders. Credit Suisse further contends that summary judgment is appropriate on OHC's breach of implied contract claim because Credit Suisse did not assume an implied contractual duty to provide general financial advice to Oakwood. Finally, Credit Suisse contends that OHC cannot point to "a shred" of evidence in the record demonstrating Credit Suisse caused OHC's damages. (D.I. 59 at 1.)

3

## II.  Factual History

Credit Suisse's motion for summary judgment is addressed to OHC's claims arising out of Credit Suisse's services to Oakwood prior to August 19, 2002, when Oakwood formally engaged Credit Suisse as its financial advisor through a letter agreement ("the Engagement Letter").  The below statement of facts will be limited to those facts relevant to the pre-August 2002 time frame.

Prior to their 2002 bankruptcy, Oakwood was in the business of designing, manufacturing and marketing manufactured and modular homes.  (D.I. 100 at 4.)  As part of this business, beginning in the mid-1990s, Oakwood began providing financing to the buyers of its products through installment sales contracts or traditional mortgages (collectively "RICs").  (D.I. 41 at Exh. G, ¶17.)  The financing aspect of Oakwood's business was aided by access to capital obtained through "securitizations," where expected payment streams were pooled and structured into bundles or "tranches" which are then sold to private and institutional investors.  (D.I. 101 at Exh. C; Muir Dep. Tr. at 42-44.)  These investors relied upon the principal and interest payments made by Oakwood's customers on the RICs for repayment.  (Id.)

Credit Suisse served as Oakwood's securities underwriter beginning in 1994, and in this capacity underwrote more than $7.5 billion in Oakwood securities, over $1.3 billion in the period

4

between 2001-2002 alone.  (D.I. 40 at 5; D.I. 100 at 4.)

Beginning in 1996, Fiachra O'Driscoll ("Mr. O'Driscoll"), a

Managing Director in Credit Suisse's Securitization Group in New

York, became the lead banker for Credit Suisse's securitization-

related work with Oakwood.  (D.I. 42 at Exh. Z; O'Driscoll Dep.

Tr. at 4-5.)

In 1999, the manufactured housing industry began

experiencing declines due to market conditions.  (D.I. 42 at Exh.

H.)  Oakwood's practice of aggressive lending had led to a high

level of repossessed homes, and this, along with other market

factors, "resulted in a heavier debt load than performance in

declining markets in 1999 could support. " (Id. at 26.)  As

Oakwood's wholesale and retail sales dropped, its revenue

declined, and its need for liquidity increased.

Mr. O'Driscoll proposed that Credit Suisse provide a

committed "reverse repurchase" facility, which would allow

Oakwood to monetize lower-rated tranches of securitization that

Oakwood had been holding on its own balance sheet.  (D.I. 100 at

5; D.I. 42 at Exh. Z; O'Driscoll Dep. Tr. at 178.)  Credit

Suisse's Credit Risk Management department ("CRM"), including

James Xanthos ("Mr. Xanthos"), reviewed this proposal, and Mr.

Xanthos wrote a memorandum ("the Xanthos memo") which stated his

opinion that the proposed credit facility should be denied.

(D.I. 53 at Exh. N.)  The Xanthos memo also stated that Oakwood

5

had "very real/immediate bankruptcy risk issues/concerns," that
"management does not have a strong understanding of its
marketplace," and concluded that Oakwood "is the weakest company
in its [industry]" and would not "meet their forecasted
profitability levels but will rather be fortunate to at best
break even." (Id.)  The Xanthos memo was not shared with
Oakwood.

Before 2001, Oakwood obtained liquidity between its
quarterly securitizations through a loan from Bank of America
secured by RICs awaiting bundling (hereinafter "the warehouse
facility").  However, at the end of 2000, Bank of America
informed Oakwood that it would not renew the warehouse facility.
(D.I. 100 at 7.)  According to OHC, by this point, due to
Oakwood's financial duress, most lenders were unwilling to
consider such a transaction with Oakwood.  (D.I. 100 at 8.)
However, in response to Oakwood's request, Mr. O'Driscoll and
Credit Suisse agreed to provide this warehouse facility, "as a
result of its structure and the economic benefit that [Credit
Suisse] can potentially realize." (D.I. 53 at Exh. R.)  In
exchange for providing the warehouse facility, Credit Suisse
received in addition to fees, a warrant to purchase just under 20
percent of Oakwood's common stock. (D.I. 100 at 7-8.)  According
to OHC, "Oakwood's weak bargaining position left it no choice but
to agree to whatever terms and conditions Credit Suisse proposed,

no matter how onerous." (<u>Id</u>. at 8.)

An increasingly high number of repossessed homes led Oakwood to increase the use of its Loan Assumption Program. (D.I. 42 at Exh. BB; Standish Dep. Tr. at 27.)  Under this program, Oakwood's defaulting borrower would find a third-party to purchase the home, and assume remaining payments on the RIC. (<u>Id</u>. at 28-29.)  Before 2000, the Loan Assumption Program was only utilized if the existing borrower could find a purchaser with satisfactory credit; however, from 2000 forward, Oakwood's third-party credit requirements were much less stringent.  <u>In re Oakwood Homes Corp</u>., 340 B.R. at 517.  Oakwood ultimately discontinued the Loan Assumption Program in June 2002, but not before it cost Oakwood about $50 million in liquidity. (D.I. 40 at 9.)

Through Credit Suisse, Oakwood entered into other financing transactions over the next year, including the sale of servicing advance receivables to Prudential Insurance, and the "LOTUS" transactions, through which Credit Suisse arranged for the sale of Oakwood's "B Pieces," or most subordinated tranches of the securitizations, to Berkshire Hathaway in 2001.  Credit Suisse negotiated these transactions on behalf of Oakwood.  (D.I. 52 at Exh. B; Millard Dep. Tr. at 16-18; D.I. 53 at Exh. W.) Also, Oakwood's Chief Financial Officer, Bob Smith ("Mr. Smith"), often emailed Mr. O'Driscoll material non-public information, seeking his advice about Oakwood's business problems. (D.I. 53 at Exhs.

7

T, U, X, DD, GG, HH.).  Mr. O'Driscoll would occasionally contact
Oakwood's outside counsel without copying anyone from Oakwood
(D.I. 53 at Exhs. EE.)

According to OHC, Mr. O'Driscoll also attempted to seek out
and structure other transactions for Oakwood, and suggested that
his colleague, Jared Felt ("Mr. Felt") pitch bond buyback
proposals to Oakwood.  (D.I. 100 at 10.)  In connection with
these proposals, Mr. Felt asked Mr. O'Driscoll whether a draft
engagement contract should contain a "lockup" requiring Oakwood
to contractually commit to using only Credit Suisse as an
investment banker for various transactions.  (D.I. 101 at Exh.
K.)  Mr. O'Driscoll responded that this was unnecessary, since
the "idea of [Oakwood] doing anything away from us is so unlikely
that it's probably a little offensive to them," and that the
nature of Credit Suisse's role with Oakwood made Oakwood "feel
very shackled" to Credit Suisse in a "positive, partnership way
at the moment."  (Id.)

Credit Suisse does not deny that Mr. O'Driscoll, recognizing
Oakwood's financial difficulties, introduced Oakwood to Mr. Felt
and Credit Suisse's Restructuring Group. Beginning in June 2001,
representatives from this group made several business pitches to
Oakwood, attempting to convince Oakwood to retain Credit Suisse
as Oakwood's financial advisor. (D.I. 52 at Exh. A; Felt Dep. Tr.
at 62-66.)  On August 19, 2002, Oakwood formally engaged Credit

Suisse as its financial advisor through the Engagement Letter.

**PARTIES' CONTENTIONS**

I.   **In Pari Delicto**

Credit Suisse contends that Oakwood's financing techniques and transactions were authorized, directed and controlled by Oakwood, acting through its Board of Directors (hereinafter, the "Board") and Management.  Accordingly, Credit Suisse contends, since it provided its securitization services at the direction of Oakwood's Board and Management, OHC, as Oakwood's successor, is barred by the doctrine of *in pari delicto* from asserting any claim for damages arising out of those services.  Credit Suisse also contends that the evidence in the record before the Court demonstrates that Oakwood's Board and Management were informed of and ratified the financing methods and strategy now labeled by OHC as improper.  Credit Suisse further contends that the record before the Court establishes that Credit Suisse was not an "insider" of Oakwood.  Finally, Credit Suisse contends that because there is no dispute that Oakwood was responsible for the allegedly harmful financing methods it employed, this matter is appropriate for disposition on summary judgment.

OHC sets forth three arguments why summary judgment should not be granted based on Credit Suisse's *in pari delicto* defense. First, OHC contends that the wrongdoing alleged in this action is personal to Credit Suisse.  According to OHC, the "wrongdoing" at

9

issue is Credit Suisse's concealment of their knowledge and true
opinions of Oakwood, and their "stamp of approval on Oakwood's
continuation of a disastrous course." (D.I. 100 at 20.)   OHC
contends that this wrong is entirely separate from the incorrect
business judgment observed by Oakwood's Board and Management, and
thus it cannot be said that Oakwood had any involvement in the
wrong alleged in this action.

Second, OHC contends that a reasonable jury could find that
Credit Suisse was an "insider" based on the evidence in the
record before the Court, including Mr. Felt's labeling of Credit
Suisse as an "insider," the level of trust and confidence between
the parties, the many different "hats" worn by Credit Suisse,
Credit Suisse's receipt of non-public information, and Mr.
O'Driscoll's email to Mr. Felt regarding a contractual "lockup"
provision.  (D.I. 100 at 22.)   OHC also contends that Credit
Suisse's proposition that insider status is determined by
"control and the ability to dictate corporate policy" is legally
incorrect, since several courts have rejected the proposition
that "control" is a necessary aspect of the insider analysis, and
have instead held that "an insider relationship may be found
where the relationship between the parties is sufficiently close
to warrant careful scrutiny." (D.I. 100 at 25.)

Finally, OHC contends that *in pari delicto* is limited to
those situations where the plaintiff bore at least substantially

10

equal responsibility for the injury.  Accordingly, OHC contends
that, if *in pari delicto* applies, the jury should make the
findings regarding the respective amount of blame assigned to
each party, granting relief to the one whose wrong is less.  OHC
contends that any wrong attributable to Oakwood "pales when
viewed" against Credit Suisse's intentional, active participation
in, and facilitation of, the relevant transactions, while knowing
their value-destroying effects. (D.I. 100 at 27.)

In response, Credit Suisse contends that OHC's attempt to
separate the alleged "wrongs" committed by Oakwood and Credit
Suisse is belied by the evidence which makes clear that there was
a single strategy now labeled by OHC as wrongful: Oakwood's
attempts to survive an industry downturn, for which the
securitizations were necessary.  Credit Suisse further contends
that OHC's reliance on the Bankruptcy Code's definition of
"insiders" and cases interpreting that definition is misplaced
because *in pari delicto* is an equitable doctrine, not a matter of
bankruptcy law.  Credit Suisse contends it was not in a position
of domination and control over Oakwood, and thus cannot be
labeled as an insider.  Finally, Credit Suisse contends that
OHC's contentions regarding relative fault apply only when *in
pari delicto* is raised in defense to a claim under the federal
securities laws.

11

## II.  Breach of Fiduciary Duty

Credit Suisse contends that, if Credit Suisse did owe Oakwood a fiduciary duty, this duty ran to Oakwood, not to some particular group of creditors.  Credit Suisse contends that the theory of fiduciary liability espoused by OHC's proffered duty of care expert that, once Oakwood was insolvent, Credit Suisse owed a duty to Oakwood's bondholders alone, is wrong.  Credit Suisse contends that it "defies reason-but is Plaintiff's position-that even though Oakwood's board cannot be liable for damages caused by delaying the Company's bankruptcy, Credit Suisse can."  (D.I. 40 at 23.)

OHC contends that the beneficiaries of the Plaintiff-trust are all sorts of Oakwood creditors, not just bondholders, and that neither OHC's case or the testimony of OHC's expert turns on the existence of some direct and exclusive fiduciary duty to creditors.  Instead, OHC contends, Credit Suisse had a fiduciary relationship with Oakwood, which required at least some consideration of the interests of Oakwood's creditors once Oakwood was insolvent.

## III. Breach of Implied Contract Claim

Credit Suisse contends that the "conduct of Oakwood and Credit Suisse plainly demonstrates that they did not believe they had entered into a contract for Credit Suisse to provide the Company financial advisory services prior to August 19, 2002, as

evidenced by Credit Suisse's repeated attempts to convince
Oakwood to hire it for those services Oakwood now claims Credit
Suisse was contractually obliged to provide." (D.I. 40 at 23.)
In response, OHC contends that there is ample evidence that
Credit Suisse was acting as a Financial Advisor prior to August
19, 2002, thus creating an implied contract.  OHC contends that
the record evidence demonstrates that Oakwood repeatedly turned
to Credit Suisse for advice unrelated to securitization and
Credit Suisse repeatedly gave such advice.

**IV.  Negligence Claim**

Credit Suisse contends that OHC has not set forth evidence
sufficient to establish that Credit Suisse's provision of
securitization services was anything other than professional and
capable.  In response, OHC contends that Credit Suisse
misunderstands OHC's theory of negligence, since "this case is
about far broader questions, such as whether any 'services'
should have been provided at all" once it was known to Credit
Suisse "that Oakwood was hopelessly insolvent." (D.I. 100 at 40.)
OHC also contends that there is clear evidence in the record that
Credit Suisse's provision of securitization services was flawed.

**V.  Causation**

Credit Suisse contends that the core harm alleged by OHC is
a delay of approximately one year in the filing of OHC's
bankruptcy.  OHC's expert has testified that, during that year,

13

the value of OHC declined by $50 million.  Credit Suisse contends
that OHC cannot prove that Credit Suisse's conduct caused the
damages allegedly suffered by OHC through competent evidence that
"establishes at least a prima facie case on the issue of
causation." (D.I. 40 at 25, quoting Money v. Manville Corp.
Asbestos Disease Comp. Fund., 596 A.2d 1372, 1377-78 (Del. Sup.
Ct. 1991). Credit Suisse contends that OHC's theory of causation
is premised on a series of speculative hypothesis lacking
evidentiary support that (1) if Credit Suisse had refused to
provide warehouse and securitization services in 2001, OHC could
have found another institution to provide the liquidity necessary
to maintain OHC as a going concern (since OHC's expert testified
that the $350 million value could only be realized if OHC had
been sold as a going concern in September 2001), and then (2) a
buyer would be located, who would have paid $350 million for the
company, which would have been a better result than what actually
happened (OHC went into bankruptcy a year later and was sold for
$373 million).  Credit Suisse thus contends that sheer
speculation as to what Credit Suisse should have done and what
steps OHC could have taken are insufficient to show causation.
Credit Suisse contends that allowing OHC to proceed transforms
Credit Suisse, the provider of securitization underwriting and
related services, into the insurer of OHC's business strategy
decisions.

14

OHC contends that it will seek the following damages at trial: (1) the $50 million diminution in Oakwood's asset value between September 2001 and September 2002, and (2) the nearly $21 million in fees that Credit Suisse received in 2001-2002.  OHC contends that, under New York law, "damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the damage, and that the damage was either a direct result or a reasonably probable consequence of the act or omission."  (D.I. 100 at 31, quoting <u>Bellis v. Tokio Marine & Fire Ins. Co.</u>, No. 9306549, 2002 U.S. Dist. LEXIS 1714, at *39-40 (S.D.N.Y. Feb. 5, 2002)).  OHC contends "the inherently fact specific nature of this inquiry makes it an issue for the jury in all but the most extreme circumstances." (D.I. 100 at 31.)  According to OHC, the issue is really only whether the damages that accrued as a result of Oakwood's "business-as-usual" path, endorsed by Credit Suisse's silence, and aided by Credit Suisse's active participation, are "sufficiently close to the breaches of duty embodied by such actions and inactions." (D.I. 100 at 32.)

### STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions,

15

answers to interrogatories, and admissions on file, together with
the affidavits, if any," that there are no genuine issues of
material fact and that the moving party is entitled to judgment
as a matter of law. Fed. R. Civ. P. 56(c).  In determining
whether there are triable issues of material fact, a court must
review all of the evidence and construe all inferences in the
light most favorable to the non-moving party.  A party seeking
summary judgment always bears the initial responsibility of
informing the court of the basis for its motion, and identifying
the evidence which it believes demonstrates the absence of a
genuine issue of material fact.  <u>Celotex Corp. v. Catreet</u>, 477
U.S. 317, 323 (1986).  If the nonmoving party fails to make a
sufficient showing on an essential element of his case for which
he bears the burden of proof, the moving party is entitled to
judgment as a matter of law.  <u>Id.</u> at 322.  Moreover, the mere
existence of some evidence in support of the nonmovant will not
be sufficient to support a denial of a motion for summary
judgment; there must be enough evidence to enable a jury to
reasonably find for the nonmovant on that issue.  <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

**DISCUSSION**

I.   *In Pari Delicto* **Doctrine**

   *In pari delicto* is short for *in pari delicto potior est
conditio defendentis*: "In the case of equal or mutual fault

16

[between two parties] the condition of the party ... [defending] is the better one." BLACK'S LAW DICTIONARY (8th ed. 2004). *In pari delicto* is a state law equitable defense analogous to unclean hands "rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct ." Pinter v. Dahl, 486 U.S. 622, 632 (1988) "Generally translated, it means the plaintiff should not therefore recover, and the parties should be left where they are. This view is predicated on the principle that to grant plaintiff relief would contravene the public good by aiding one to profit from his own wrong." Ross v. Bolton, 904 F.2d 819, 824 (2d Cir. 1990). This doctrine applies to a "bankruptcy trustee, standing in the shoes of [the wrongdoing] debtor." Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 354 (3d Cir. 2001) ("Lafferty").

A.   The "Insider" Exception

*In pari delicto* will not operate to bar claims against corporate insiders. Granite Corp. v. Primavera Familienstiftug (In re Granite Partners, L.P.), 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996); see also Floyd v. Hefner, No. 03-5693, 2008 WL 901521, at *33 (S.D. Tex. Mar. 31, 2008) (listing authorities). In the bankruptcy context,[1] the term "insider" of a corporation

---

[1] *In pari delicto* is an equitable defense based on common law, and the claims at issue in the present action do not arise under the Bankruptcy Code. The parties generally agree that New

includes: (1) the director of the debtor, (2) an officer of the debtor; (3) a person in control of the debtor, (4) a partnership in which the debtor is the general partner, (5) a general partner of the debtor, or (5) a relative of the general partner, director, officer or person in control of the debtor.  11 U.S.C. § 101(31)(B).  Additionally, 11 U.S.C. §§ 101(E) and (F) provide that an insider may also be an affiliate and a managing agent of the debtor.  However, courts have "uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term 'insider' must be flexibly applied on a case-by-case basis." In re KDI Holdings, Inc., 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999)(citations omitted).

Courts generally look to the legislative history to determine whether an entity or person qualifies as a non-statutory insider, which states, "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."  S.REP. No. 95-989, 95th Cong., 2d Sess., reprinted in 9178 U.S. Code Cong. & Admin. News, pp. 5787, 5810.  "In cases involving non-management creditors, a creditor

---

York state has the most significant relationship to this case and that its law should apply to the claims in this action. Accordingly, the Court will apply New York law.  However, because this action arises in the bankruptcy context, the Court considers case law depicting insider status in bankruptcy cases instructive.

will be held to an insider standard when it is found that it
dominated and controlled the debtor." In re KDI Holdings, Inc.
277 B.R. 493, 511(Bankr. S.D.N.Y. 1999). Courts have "applied
insider status "flexibly to include a broad range of parties who
have a close relationship with the debtor," focusing on the
"closeness between the transferee and the debtor, the degree of
control or influence the transferee exerts over the debtor, and
whether the transactions were conducted at arm's length. In re
Oakwood Homes Corp., 340 B.R. at 523 (quoting In re Locke Mills
Partners, 178 B.R. 697, 702 (Bankr. M.D.N.C. 1995). More
specifically:

> In determining whether a creditor, and particularly a
> bank, has the requisite level of control to be an
> insider, the courts examine whether the creditor had
> more ability to assert control than the other
> creditors, whether the creditor made management
> decisions for the debtor, directed work performance,
> and directed payment of the debtor's expenses. ABC
> Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC
> Elec. Serv. Inc.), 190 B.R. 672 (Bankr. M.D. Fla.
> 1995). There must be day-to-day control, rather than
> some monitoring or exertion of influence regarding
> financial transactions in which the creditor has a
> direct stake.

In re Winstar Communications, Inc., 348 B.R. 234, 279 (Bankr.
D.Del. 2005) (quoting In re Armstrong, 231 B.R. 746, 749-50
(Bankr. E.D. Ark.1999)).

II.  **Analysis**

The Court concludes that the doctrine *in pari delicto* bars
OHC's claims against Credit Suisse, and that OHC has not set

19

forth sufficient evidence from which a juror could reasonably conclude that Credit Suisse was an Oakwood insider so as to preclude the application of this doctrine.

     A.   Oakwood's Active Participation in the Alleged Wrongdoing

OHC now characterizes Oakwood's continuing use of securitization transactions, use of Credit Suisse's "warehouse" facility, and/or participation in the LOTUS transactions as "value-destroying and unreasonable," and places almost sole responsibility for these "value-destroying" transactions at Credit Suisse's feet. (D.I. 100 at 3.) However, the evidence in the record before the Court indicates that the decisions to engage in these transactions were made by Oakwood's informed and involved Board and Management.[2] That OHC does not endorse the

---

[2] During oral argument, counsel for OHC suggested that Oakwood's Board and Management were unsophisticated "rubes," out of their element and unable to comprehend the ramifications of their business decisions. The Court is not persuaded. During the relevant time frame, Oakwood's Board of Directors was comprised of experienced business and legal professionals. For example: a president of a real estate development and management company, a former law partner at Kennedy Covington Lobdell & Hickman, LLP, a chairman of a real estate development company, a chairman of Major League Baseball, an Executive-in-Residence at Columbia University Graduate School of Business and the former Managing Director of a securities corporation, and a law partner at Baker & McKenzie, among other esteemed professionals. (See D.I. 40 at 4.) The fact that Oakwood's Board and Management may have been *less* knowledgeable than Credit Suisse regarding the securitization techniques at issue "hardly amount[s] to total domination and control" by Credit Suisse. Hirsch v. Arthur Anderson & Co., 72 F.3d 1085, 1095 (2d Cir. 1995). "Indeed, it is the ordinary situation for generalist business executives to be less skilled and knowledgeable concerning specialized areas of

decisions of the Board and Management does not alter their status
as decisions that were made by Oakwood, not by Credit Suisse.   In
fact, by their brief, OHC admits that the Oakwood Board and
Management were responsible for the adoption of a business plan
that "ultimately failed" (D.I. 100 at 20).   Absent Oakwood's
determined "business as usual" corporate strategy, Credit Suisse
would not have executed any of the transactions depicted as
"value destroying."  (D.I. 100 at 3.)   As aptly stated in
<u>Official Committee of Unsecured Creditors of Allegheny Health,</u>
<u>Education and Research Foundation v. PricewaterhouseCoopers,</u>
<u>L.L.P.</u>, No. 2:00cv684, 2007 WL 141059, at *15, "[t]he very harm
allegedly suffered at the hands of [Defendant], ... presupposes
the Board approved business strategy, as well as the imputable
wrongdoing of ... management."

    B.   <u>The "Insider" Exception Does Not Apply</u>.

    The undisputed evidence establishes that Oakwood's Board and
Management were responsible for the business decisions and
strategy forming the basis of OHC's contentions.   Credit Suisse
assisted Oakwood's implementation of its "flawed" (D.I. 100 at
20) business plan by structuring and executing these
transactions, transactions which provided the liquidity necessary
for Oakwood's continued operation, exactly what Oakwood employed

---

activity than the professionals...engaged in those areas of
activity on behalf of the business enterprise."  <u>Id</u>.

Credit Suisse to do.

OHC contends that "control" is not a necessary aspect of the "insider" analysis.  (D.I. 100 at 24.)  However, in the Court's view, the insider exception makes little sense without some showing of control or domination by the alleged insider over the debtor.  The justification for the insider exception is that *in pari delicto* should not apply "[w]here the parties do not stand on equal terms and one party controls the other".  In re KDI Holdings, Inc. 277 B.R. at 518 (citing Kalb, Voorhis & Co. v. American Financial Corporation, 8 F.3d 130, 132 (2d Cir. 1993).

In the Court's view, OHC has not adduced evidence sufficient to establish that Credit Suisse exercised sufficient authority over Oakwood to justify the application of the insider exception to *in pari delicto*.  Oakwood's Management and Board members testified in deposition that they were steering the boat, driving business decisions and strategy, not Credit Suisse.  For example, during his deposition, Myles Standish, a former Chief Executive Office of Oakwood, testified to the following regarding Oakwood's Loan Assumption Program:

> Q:   Now...you alluded to the assumption program and
>      specifically the allegations and the counterclaims
>      relating to it; is that right?
> A:   Yes. I did.
> Q:   Is there some aspect of those allegations you believe
>      to be incorrect?
> A:   ...While [Credit Suisse] was certainly aware of the
>      loan assumption program and what Oakwood was doing with
>      respect to the loan assumption program, I disagreed
>      with the idea that [Credit Suisse] was the driving

force behind the loan assumption program...
...

Q:  Was the decision to institute the loan assumption
    program made exclusively by Oakwood?
A:  Well, as I said, I think CSFB knew what we were doing
    and I believe that [Mr. O'Driscoll]-it would have been
    discussed with [Mr. O'Driscoll] prior to doing it to
    make sure there would be no adverse effect on our
    securitization program; but as far as the decision
    to—well, let me-let me back up. Your-the question is
    really based on an incorrect factual assumption and
    that is that in -I believe in 2000 or 2001, whatever
    time period we're talking about that we instituted a
    loan assumption program, there an always been a loan
    assumption program at Oakwood Acceptance Corporation.
    The-and it's fairly typical in the industry.  What we
    did was there was a decision to expand to be somewhat
    more aggressive in the loan assumption program sometime
    in the 2000, 2001 time frame. And that's what I'm
    really talking about. And I'm sure before expanding
    that program it was discussed with [Mr. O'Driscoll] *but
    as far as the decision to go ahead and expand that
    program, that decision was made by Oakwood management.*
Q:  And to your knowledge was the Oakwood board of
    directors apprised of Oakwood's use of the assumption
    program?
A:  Yes. And the world was apprised of the assumption
    program. I think that it was in all of our public
    documents...

(D.I. 101 at Exh. F; Standish Dep. Tr. at 25 - 28)(emphasis

added.) More generally, Mr. Standish testified:

Q:  But ultimately it was the prerogative and
    responsibility of the board to make the decisions as to
    which options to pursue; isn't that correct?
A:  Certainly the board-to actually pursue an option, the
    board or management would have to be the ones to say
    that we were going ahead with that option, yes.

(D.I. 52 at Exh. F, Standish Dep. Tr. at 17:2-8.)
...
Q:  Can you think of a specific corporate transaction that
    Oakwood entered at the direction of Credit Suisse?
A:  Certainly any underwriting we should have entered into,
    it would been at the-with the advice-or any
    securitization-excuse me-that we would have entered

23

> would have been with the advice of [Credit Suisse]. We
> often sought [Credit Suisse's] advice on anything
> pertaining to our-to our loan underwriting. If you're
> asking do I remember [Credit Suisse] essentially
> ordering us to do something and we complied with that,
> I don't recall that. *It was more of a mutual
> situation.* (emphasis added)
>
> Q:   Did Credit Suisse have the ability to force Oakwood to
>      engage in a securitization transaction if the board
>      determined that wasn't in the company's interest?
> A:   Well, I don't remember those circumstances happening.
>      As I said, if Credit Suisse would have come to the
>      board and said you do this or we will no longer serve
>      as underwriter and we'll withdraw the loan purchase
>      facility, it would have put the board in a difficult
>      position.
> Q:   But that never happened, right?
> A:   That's correct. I do not recall that happening.

(<u>Id.</u>; Standish Dep. Tr. at 20-21.)  Douglas Muir, a former

Oakwood officer, and an individual directly involved with

Oakwood's securitization program ("Mr. Muir"), testified as

follows:

> Q:   Did Credit Suisse ever try to tell management what to
>      do in terms of operating the company?
> A:   Not that I can remember. [They would weigh in when
>      asked] but *did they ever attempt to direct us, no."*
>      (emphasis added)
>                          . . .
> Q:   Did Credit Suisse try to weigh in on your day-to-day
>      management decisions?
> A:   Let me answer it this way. It was not unusual, and, in
>      fact, it was practice for me anytime we made any
>      substantive business decision that might have a
>      material impact or even a less than material but
>      significant impact on anything having to do with loan
>      originations, the ABS program, loan servicing, it was
>      my practice always to inform CSFB of what we were doing
>      and why we were doing it and solicit feedback. So to
>      the extent that's weighing in, yeah, they sure did.
>      They were asked to weigh in.
> Q:   But you were asking Credit Suisse to weigh in on
>      matters that might affect the fate of securitizations
>      on the market, right?

24

A:   That might–things that might affect the performance of securitizations that had already been done, things that might have the ability–an effect on our ability to do securitizations in the future.  Things that might have had an effect on if not whether or not a future transaction would get done but the terms on which it would get done, marketplace reception to securities that had certain loans in them, rating agency views on underwriting decisions, all of those kinds of things were routinely discussed.

Q:   And did you always do whatever Credit Suisse told you to do when you consulted with them?

A:   I don't ever recall being told to do anything by CSFB. There were decisions that were made that CSFB and I think thought were good decisions and said so.  And I think there are things we did that CSFB, meaning [Mr. O'Driscoll], thought were not so good.  And I thought highly of [Mr. O'Driscoll's] opinion and if [he] thought we were making a mistake in something, I certainly conveyed that back. And we valued him and trusted him and valued his judgment.

Q:   So is it fair to say that sometimes Credit Suisse agreed with what you were doing and sometimes Credit Suisse didn't, but management did what it thought was best?

A:   I think it retrospect and even at the time CSFB would tell you we did some things that we told them we were doing that they didn't think were very smart and some things that conversely they thought probably were very smart.

(D.I. 52 at Exh. C; Muir Dep. Tr. 194-196.) Mr. Muir also

testified regarding the warrant Oakwood granted Credit Suisse:

Q:   What were Oakwood management's criteria for determining how much they thought it would be appropriate to pay Credit Suisse for the OMI Note Trust Facility?

A:   ...we did the best we could and ultimately agreed on a package that we agreed was in our best interests to do and that our board agreed that it was in our best interests to do it.

(D.I. 101 at Exh. C; Muir Dep. Tr. 51:7-22.)  The Court also

notes the deposition testimony of Clarence Walker ("Mr. Walker"),

a former member of Oakwood's board of directors, that Credit

25

Suisse "certainly did not" have day-to-day control of Oakwood's
decision-making process.  (D.I. 43 at Exh. DD; Walker Dep. 37:20-
25.)  Regarding the Board's involvement in Oakwood's decision to
continue its securitization program, Mr. Walker testified:

> Q:  Am I correct, Mr. Walker, that the board of directors
> was kept apprised by senior management of developments
> in the securitization market?
>
> . . .
>
> A:  You are correct. The board was kept advised in a
> general way by both senior management and the audit
> committee, and the audit committee was kept advised in
> a more-in more depth by Doug Muir.
>
> Q:  Am I correct that the board of directors approved the
> use of securitizations by the company to generate
> liquidity?
>
> . . .
>
> A:  You are correct in this sense.  The securitization
> program had been an integral part of the company's
> operation for a long time.  I don't recall when it was
> first initiated, but it certainly was not in this 2001-
> 2002 period, it was earlier than that. And the board
> got continual reports about the status of the
> securitization and acquiesced in it.  Now I don't think
> particular securitizations were ever presented to the
> board for its approval, but board was fully aware of
> how the program operated, how it was doing and at no
> time undertook to mandate the discontinuance of it.
>
> . . .
>
> Q:  In your capacity as a director, do you have any reason
> to believe that the securitizations engaged in by
> Oakwood were a harmful financing technique?
>
> A:  No.

(D.I. 101, Exh. G; Walker Dep. Tr 32-34).  Mr. Walker also
testified that the board of directors was apprised of the
warehouse facility, and "approved" of this transaction generally
by "acquiescing after having been informed of this operation."
(Id. at Tr. 34-35.)

The minutes from Oakwood's Board of Directors meetings are

26

further evidence that the Oakwood's Board and Management were
fully apprised of and approved the securitization program,
including the LOTUS Transactions and the B-tranches.  (See, e.g.,
D.I. 42 at Exh. O. (October 16, 2000 Board of Directors Meeting
where "[i]n response to a question, Mr. Muir gave a brief report
on the Corporation's asset-back securities program, the ABS
market generally and ABS-related risks affecting the Corporation.
The next item of business was a report by Mr. [Robert A.] Smith
[Oakwood's Executive Vice President of Financial Operations and
Assistant Secretary,] on the status of management's efforts to
obtain replacement financing for the Corporation's existing
warehouse and revolving credit facilities."); see also D.I. 42 at
Exh. P (November 15, 2000 Board of Directors Meetings where Board
heard reports from management on the status of new short-term
credit facilities which management was negotiating, that CSFB
would require a warrant covering a significant number of shares
of the Corporation's common stock as part of the consideration
for the facility, and the status of efforts to monetize some or
all of the Corporation's inventory of subordinated asset-backed
securities, as well as the liquidity issues associated with
providing retail financing for customers desiring to purchase
repossessed homes.).)

　　　OHC alleges that due to OHC's precarious financial position
and Credit Suisse's receipt of non-public information, Credit

Suisse was the "only game in town," (D.I. 100 at 8), and held all
the bargaining cards in transactions entered between the parties.
Accepting this allegation in its entirety, the Court concludes
that this is legally insufficient to establish insider status
under the applicable case law.[3]  See, e.g., KDI Holdings, 277
B.R. at 511 ("To establish domination and control by a lender,
the allegations must indicate something more than the monitoring
of a debtor's operations and proffering advice to management,
even where the lender threatens to withhold future loans should
the advice not be taken.")(citations omitted); see also In re
Radnor Holdings Corp., 353 B.R. 820, 841 (Bankr. D. Del.
2006)(access to performance reports and other financial
information from the Company is insufficient to establish insider
status); In re Granite Partners, 194 B.R. at 332 (allegations in
complaint filed by debtor regarding third-party brokers alleged
participation in corporate mismanagement, waste and breach of
fiduciary duty failed to meaningfully allege "domination and
control" by brokers so as to preclude application of in pari
delicto); Sullivan Haas Coyle, Inc. v. William Goldberg & Co.,
Inc. (In re Sullivan Haas Coyle, Inc.), 208 B.R. 239, 245-246

---

[3]Particularly in light of Mr. Standish's testimony quoted
*supra* that, while the Board would have been in a difficult
position had Credit Suisse threatened to "no longer serve as
underwriter" and to "withdraw the loan purchase facility", *that
never actually happened.* (D.I. 52 at Exh. F; Standish Dep. Tr.
22.)

(N.D.Ga. 1997)(consultants hired to give financial advice to debtor were not "insiders," despite consultants' day-to-day involvement for two years in debtor's cash management, where transactions between consultants and debtor were conducted at arm's length, consulting agreement was terminable at will by either party and consultants could not sign checks for debtor, could not hire or fire employees and had no role in production or operation of business. ).[4]

    C.   OHC's Theory of "Separate" Wrongs

The Court concludes that OHC's attempt to separate the "wrongs" committed by Oakwood and Credit Suisse is unsupported by relevant case law.  As stated by the court in Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1090 (2d Cir. 1997), this "hypertechnical interpretation of the *in pari delicto* doctrine is outdated" as "it is not necessary that [the] wrongdoing of plaintiff and defendant be clearly mutual, simultaneous, and relatively equal." See also UCAR Intern. Inc. v. Union Carbide Corp., No. 04-0741-CV, 119 Fed.Appx. 300, 302 (2d Cir. 2004)("In fact, the law does not require defendants' and UCAR's wrongdoing

---

[4]OHC relies heavily on Lucent Technologies, Inc. v. Shubert (In re Winstar Communications, Inc.), No. 06-147, 2007 WL 1232185 (D. Del. 2007).  However, as Credit Suisse points out, in Winstar, the creditor controlled the debtor's purchasing decisions, and demanded that the debtor transfer funds to the creditor, or "it would terminate negotiations for a necessary transition agreement and refuse further financing." Id. at 3. As the Court has noted, nothing of the sort occurred between Oakwood and Credit Suisse.

to be of an identical nature for the *in pari delicto* defense to apply."). OHC's allegations regarding Credit Suisse's wrongdoing are entirely based on Oakwood's financing strategies and transactions, all of which were authorized and directed by Oakwood's Board and Management, and *in pari delicto* applies.

    D.   <u>No Allocation of Culpability is Necessary</u>.

    Finally, having found that Oakwood bears at least as much responsibility for the injury of which they complain, the Court is not persuaded by OHC's contention that, if *in pari delicto* applies, a jury must weigh the respective amount of blame to be assigned. <u>See</u> <u>Bateman Eichler, Hill Richards, Inc. v. Berner</u>, 472 U.S. 299, 307 (1985) (in pari delicto is limited to "situations where the plaintiff truly bore at least substantially equal responsibility for his injury"). The Second Circuit has rejected the argument that *in pari delicto* cannot be established on the pleadings. <u>See</u> <u>Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand</u>, LLP, 322 F.3d 147, 164 (2d Cir. 2003)(applying Texas law, but stating "this Court has affirmed the dismissal of fiduciary duty claims on the pleadings upon finding that *in pari delicto* had established"); <u>see</u> <u>also</u> <u>In re The Mediators, Inc.</u>, 105 F.3d 822, 826 (2d Cir. 1997); <u>Ross v. Bolton</u>, 904 F.2d 819 (2d Cir. 1990); <u>Hirsch v. Arthur Anderson &</u>

Co., 72 F.3d 1085 (2d Cir. 1995).[5]

The Court having concluded that the doctrine of *in pari delicto* bars Plaintiff's claims against Credit Suisse, the Court will not address the other arguments made by Credit Suisse in support of their motion.

### CONCLUSION

For the reasons discussed, the Court concludes that Credit Suisse is entitled to summary judgment because the doctrine of in pari delicto bars OHC's claims against it. Accordingly, the Court will grant Credit Suisse's Motion for Partial Summary Judgment (D.I. 39), and an appropriate Order will be entered.

---

[5]Similarly, in Lafferty, the Third Circuit affirmed the District Court's dismissal of a bankruptcy trustee's deepening insolvency claim against third-parties on basis of *in pari delicto* doctrine. 267 F.3d at 354.

31